# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 11, 2003 Session

## STATE OF TENNESSEE v. PHAREZ PRICE

**Direct Appeal from the Circuit Court for Maury County**
**Nos. 12151, 12161     Jim T. Hamilton, Judge**

---

### No. M2002-01717-CCA-R3-CD - Filed April 11, 2003

---

A Maury County jury convicted the defendant, Pharez Price, of facilitation of felony murder, facilitation of attempted first degree murder, facilitation of attempted second degree murder, facilitation of attempted especially aggravated robbery, and criminal responsibility for the conduct of another for felony reckless endangerment. The trial court imposed an effective sentence of forty-three years. On appeal, the defendant contends (1) the trial court improperly found a child witness competent to testify, and (2) the evidence was insufficient to support his convictions for any of the offenses other than felony reckless endangerment.[1] We reverse and dismiss the convictions for facilitation of attempted first degree murder and facilitation of attempted second degree murder, affirm the other convictions, and remand for a determination of concurrent/consecutive sentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court**
**Affirmed in Part; Reversed in Part; Remanded**

JOE G. RILEY, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

Gary M. Howell and Delilah A. Speed, Columbia, Tennessee, for the appellant, Pharez Price.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Mike Bottoms, District Attorney General; and Robert C. Sanders and Daniel J. Runde, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

On February 22, 2000, David Houston, Randy Massey, and Paul Readus were shot, and Houston died as a result. Chastity Buie testified that she was living in an apartment on Perkins Lane in Columbia, Tennessee, with her sister, Brandi, her son, David Eric Taylor, and Brandi's two

---

[1] Other issues are listed in the defendant's brief; however, there is no mention of them in the argument portion of the brief. Such issues are considered waived. Tenn. Ct. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997).

children.  On February 21ˢᵗ, Massey, who lived in Pulaski, called Buie and requested that she help him purchase one ounce of cocaine for Houston.  She testified that on February 22ⁿᵈ, she asked the defendant, who had spent the previous night in Buie's apartment, to determine the price of the cocaine.  After making several telephone calls, the defendant informed Buie that one ounce of cocaine would cost $1,500.  When Buie called Massey and told him the price, Massey stated Houston did not want to purchase the drugs. Buie stated that when she told the defendant they did not want the drugs, the defendant became angry and said, "I'm going to fix you."

Buie testified that during one of their telephone conversations on February 22ⁿᵈ, Massey offered to take her out to eat that night for her birthday.  Massey, Readus, and Houston arrived at the apartment between 4:00 p.m. and 4:30 p.m.  The defendant was also there and, throughout the afternoon and evening, made several telephone calls.  Buie stated that after the men arrived, the defendant again asked her if the men wanted to purchase the cocaine, and she replied that they did not.

Buie testified that while she was in the bathroom, she heard a knock on the door.  Massey opened the door, and three men entered the apartment.  Buie stated her sister, Brandi, pushed her into a bedroom and closed the door, and she did not witness the subsequent shootings.  She stated she heard shots fired but was unable to determine the location of the shooting.  Buie testified she later ran outside to search for her son.  She saw Massey and Readus, both of whom had been shot, lying on the ground.

Brandi Buie (Brandi) testified the victims arrived at the apartment at approximately 5:00 p.m. At approximately 6:15 p.m., she spoke to Chastity Buie, who appeared to be upset with the defendant.  Brandi testified that upon questioning the defendant, he stated he had "something" for Chastity, and he would "show her."

Brandi testified she then heard a knock on the front door.  When Massey opened the door, Brandi saw a man wearing a blue ski mask with a "long gun" enter the apartment and yell for everyone to get down on the floor.  Brandi then heard shooting.  After the shooting stopped, she and Chastity Buie entered the living room and saw Houston, who had been shot.  Houston walked toward them, asked for help, and collapsed.  Brandi stated she then heard shots fired outside the apartment.  Brandi testified the defendant stated that he had to leave and ran toward her bedroom, which led to the balcony.

David Eric Taylor, who was ten years old at the time of the incident, testified he heard the defendant talking on the telephone after the victims arrived.  He stated he heard the defendant say, "Bring the guns," but he did not know to whom the defendant was speaking.  Approximately ten to twenty minutes later, someone knocked on the front door and Massey opened it.  Taylor stated a man holding a shotgun entered the apartment, and Massey and Readus wrestled him to the ground.  Two men with "hand-held guns" entered the apartment, and Taylor heard shots fired.

Taylor saw the defendant turn Houston's body over and reach into his back pocket, where Taylor had earlier seen Houston place money.  The defendant then ran toward the back of the

apartment.  Taylor testified he saw the three assailants running away, and he saw the defendant run after them.  He stated that while they were running, one of the assailants said, "Come on, Pharez."

Paul Readus testified that after he, Houston, and Massey arrived at the apartment, the defendant stated that he was tired and went into a bedroom.  He stated the telephone rang several times, and someone in the back of the apartment answered it each time.  Readus heard a knock at the front door, and when Massey opened it, two men holding guns and wearing masks entered the apartment.  Houston struggled with the first man, who had a nine millimeter revolver, and Readus struggled with the second man, who had a "longer-type gun."  The assailant, who was wrestling with Houston, then shot Houston.  Readus testified he was shot a total of five times.  He was shot in his knee, stomach, finger, elbow, and finally, in his back, which permanently paralyzed him.

Randy Massey testified that on February 21st, he called Chastity Buie and requested she help him purchase an ounce of cocaine for Houston.  Buie then called him and quoted a price of $1,500.  After conferring with Houston, Massey told Buie that Houston no longer wanted to purchase the drugs.  On February 22nd, Buie called Massey and asked him if he were going to take her out to eat for her birthday, and he stated he would.

Massey, Readus, and Houston came to the apartment in a Lincoln Towncar.  Massey stated that while they were at the apartment, someone knocked on the front door.  When he opened the door, two men with guns entered the apartment.  One of the assailants had an assault rifle, one had a nine millimeter revolver, and one of the assailants was wearing a mask.

Massey testified that he ran down the hallway and into the bedroom planning to jump from the balcony.  Massey stated that when he reached the bedroom, the assailants ordered him to stop.  He then grabbed the defendant off of the bed and held the defendant in front of him as a shield.  Massey stated the assailants told him several times to release the defendant.  Massey then pushed the defendant onto the assailants and ran down the hallway toward the front door.  Massey testified that when he ran outside the apartment, he was shot in his right hip and upper left thigh.

Special TBI Agent T.J. Jordan testified he and Detective Roy Sellers obtained an initial oral statement from the defendant the day after the incident.  Detective Sellers testified the defendant stated that while he was in a bedroom, he heard a knock on the front door, and someone answered it.  Three men entered the apartment, and one of the victims ran into the bedroom and hid behind the defendant.  The defendant stated one of the assailants, a short man wearing a baseball cap, pointed a black handgun at him and demanded he lie on the floor.  The defendant told the officers that while he was lying on the floor, he heard "scuffling" and shots.  The defendant then arose from the floor, ran outside to the balcony, jumped from the balcony, and ran toward a bypass highway.

Detective Sellers testified the officers discovered a bloodstain, which appeared to have been left by a hand, on the top rail of the balcony.  The detective stated that when he confronted the defendant with this information, the defendant admitted he had blood on his body but did not know how it got there.

Agent Jordan testified that on March 3rd, they again interviewed the defendant, who gave a written, signed statement. During this interview, the defendant stated the victims called Chastity Buie and requested she obtain one ounce of cocaine for them. After Buie asked the defendant for his help, he paged Tony Walker in order to obtain Omar Jennings' pager number. The defendant then paged Jennings, and when Jennings answered his page, the defendant asked him to obtain the drugs. Jennings told the defendant the price of the drugs was $1,500. The defendant stated he related this information to Buie, but she never told him whether the victims still wanted to purchase the drugs. The defendant further stated that in the meantime, he called several people and asked them to drive him back to his home.

The defendant stated that when the victims arrived at the apartment, he believed they still wanted to purchase the drugs. When Buie told the defendant that they no longer wanted to purchase the drugs, he told her "that was kind of messed up." The defendant stated they did not argue. The defendant stated that he paged Jennings in order to inform him that they did not want to purchase the drugs. Jennings then called the apartment. The defendant stated that when he informed Jennings they did not want the drugs, Jennings became upset and said, "I'll take care of that." Jennings further stated he would be at the apartment in ten minutes. The defendant told the police he believed Jennings was going to drive him to his residence.

The defendant stated that shortly thereafter, he heard a knock on the front door. He then heard a commotion and one of the victims ran into the bedroom behind the defendant. According to the defendant, Jennings then entered the room, pointed a gun at them, and ordered them to lie down on the floor. While the defendant was on the floor, he heard a struggle, and this victim ran out of the room while Jennings shot at him.

The defendant told the police that after the shooting stopped, he was "shook up" and "kind of blacked out." The defendant admitted reaching inside Houston's pocket but stated he did not know why he did so. The defendant stated he did not get any money from Houston, but he did get blood on his hand.

The defendant told the police he then ran toward the community college and caught a ride with his friend, Joan Bouris. He stated that when he called his mother the next morning, she informed him that the police were looking for him. The defendant went to the police station. He denied setting up a robbery and stated he did not originally tell the police about Jennings because he was afraid.

Agent Jordan testified that the police subsequently located Jennings, Jason Pillow and Demarcus Gant. Based on information from Gant, the officers recovered a .357 Magnum revolver and a Ruger nine millimeter revolver. Tests revealed that nine millimeter shell casings recovered from the scene were fired from the Ruger revolver. A ski mask was also found on the scene, and tests linked the mask to Gant.

Agent Jordan testified he took a sworn written statement from Jason Pillow. Pillow told the officers that Jennings approached him regarding a drug transaction with men who were from out of town. He stated Jennings and the defendant had planned the drug transaction. Pillow, Jennings, and

Gant then went to the apartment to conduct a drug transaction. Pillow stated that although they each had guns, he had a gun because he believed he was going to conduct a drug deal. He maintained he had no prior knowledge of a robbery.

Pillow told the officers that upon entering the apartment, Jennings and Gant fought with the men who were inside. He admitted he shot Houston. Pillow maintained the incident "wasn't supposed to go down like that."

Demarcus Gant, who pled guilty to charges arising out of the incident, testified that on February 22nd, Jennings and Pillow approached him and asked him to help them rob some men who were from out of town. Gant agreed, retrieved his gun and an SKS assault rifle, and entered Pillow's Monte Carlo, which Jennings was driving. Gant testified they stopped at a Texaco station located near the community college. Jennings called the defendant and spoke to him for two to three minutes, and Gant then spoke to the defendant. Gant stated the defendant told him he was going to leave the back sliding glass door open. Gant stated Jennings told him that the men were not expected to be armed. Although Jennings did not tell him the exact amount of cash the men were supposed to have, he did inform Gant that they were attempting to purchase cocaine.

Gant testified that in order to recognize whether the men were still at the apartment, the defendant told him to look for a maroon Lincoln Towncar parked in front of the residence. They drove down Perkins Lane, saw the vehicle, and parked one street down from the apartments, approximately eighty to one hundred yards away. Gant stated that upon entering the apartment, either Jennings or Pillow yelled, "Get on the ground." A struggle then ensued. Gant testified that while he was struggling with two of the victims, he heard gunshots. One of the victims then ran out the front door, and Gant heard three or four additional gunshots. Gant stated Pillow then shot the man who had continued to struggle with Gant. Gant maintained he never fired his weapon, but Pillow and Jennings fired their weapons approximately ten times.

Gant testified he, Jennings, and Pillow ran to their vehicle, and Jennings drove to Gant's residence. Jennings then called the defendant, and Gant briefly spoke to him. When Gant asked the defendant what went wrong, the defendant stated he did not know. Gant testified that when he went to the apartment, he intended only to rob the victims.

Crystal Runions, who testified for the defense, stated that on February 22nd, she received a telephone call from the defendant who requested a ride to his residence. Runions stopped at a Quick Mart and paged the defendant from a pay phone. Runions stated that while waiting for the defendant to answer the page, she saw Jennings and two other men drive into the store's parking lot. Runions testified the defendant called her on the pay phone, and she planned to pick him up at the apartment. She stated that after speaking to Jennings, she decided not to pick up the defendant and drove to her home in Hampshire. Runions testified the defendant came to her residence between 8:00 p.m. and 10:00 p.m. and slept on her couch that night.

Joan Bouris testified that upon returning from a college class at approximately 8:25 p.m., she found the defendant in her truck. She then drove him to a trailer in Hampshire. Bouris stated the

defendant did not act unusual, but he was quiet. Michelle Ship testified that on February 22nd, the defendant called her three or four times requesting a ride to his residence.

Karen Richardson, the custodian of telephone records, testified that on February 22nd, there were three telephone calls placed between the Buie residence and a telephone number listed under Evelyn Ray. Evelyn Ray later testified she is Jennings' mother. These calls were placed at 5:34 p.m., 5:50 p.m., and 6:16 p.m. At 7:07 p.m., someone placed a call from the Buie residence to a pay phone at a Quick Mart.

The defendant was charged with the felony murder of David Houston, two counts of attempted first degree murder of Randy Massey and Paul Readus, especially aggravated robbery, and felony reckless endangerment. The jury convicted him of facilitation of the felony murder of Houston, facilitation of attempted second degree murder of Massey, facilitation of attempted first degree murder of Readus, facilitation of attempted especially aggravated robbery, and criminal responsibility for the conduct of another for felony reckless endangerment. The trial court imposed consecutive sentences of twenty-five years for facilitation of felony murder, six years for facilitation of attempted second degree murder, and twelve years for facilitation of attempted first degree murder. The trial court further imposed concurrent sentences of six years for facilitation of attempted especially aggravated robbery and two years for felony reckless endangerment, for an effective sentence of forty-three years.

## I. COMPETENCY

The defendant contends the trial court erred in finding David Eric Taylor, a twelve-year-old child, competent to testify at trial. We disagree.

Prior to Taylor's testimony at trial, he and the trial court engaged in the following exchange:

| | |
|---|---|
| THE COURT: | All right. David, do you know what it means to tell the truth? |
| THE WITNESS: | Yes, sir. |
| THE COURT: | Do you know the difference between telling the truth and a story? |
| THE WITNESS: | Yes, sir. |
| THE COURT: | What happens to you if you tell a lie or tell a story? |
| THE WITNESS: | Well, I get a whuping. |
| THE COURT: | You get a whipping? Okay. You get into some trouble, too, wouldn't you? |
| THE WITNESS: | Uh-huh. [*affirmative*]. |
| THE COURT: | Okay. So, today, would you tell us the truth and nothing but the truth, and these gentlemen and ladies are going to ask you a few questions? Would you do that? |
| THE WITNESS: | Yes, sir. |

The trial court found that Taylor understood the difference between the truth and a lie and allowed him to testify.

Rule 601 of the Tennessee Rules of Evidence provides that "every person is presumed competent to be a witness." No one is automatically prohibited from testifying because of age or mental status. State v. Caughron, 855 S.W.2d 526, 537-38 (Tenn. 1993). "So long as a witness is of sufficient capacity to understand the obligation of an oath or affirmation, and some rule does not provide otherwise, the witness is competent." *Id.* at 538. To understand the obligations of an oath, the witness must simply be aware of and sensitive to the obligation to tell the truth under oath. *See* State v. Jackson, 52 S.W.3d 661, 667 (Tenn. Crim. App. 2001). The question of competency is a matter left to the discretion of the trial court. Caughron, 855 S.W.2d at 538. The trial court's determination on competency will not be overturned absent a showing of an abuse of discretion. State v. Howard, 926 S.W.2d 579, 584 (Tenn. Crim. App. 1996).

Taylor indicated to the trial court that he was aware of and sensitive to his obligation to tell the truth while testifying. He represented to the trial court that he knew the difference between the truth and a lie and stated he would be punished for lying. Taylor then told the trial court that he would tell the truth during his testimony. We conclude the trial court did not abuse its discretion in finding Taylor competent to testify at trial.

## II.  SUFFICIENCY

The defendant contends the evidence was insufficient to support his convictions for facilitation of felony murder, facilitation of attempted second degree murder, facilitation of attempted first degree murder, and facilitation of attempted especially aggravated robbery.

### A.  Motion for Judgment of Acquittal

The defendant first contends the trial court improperly denied his motion for judgment of acquittal made at the conclusion of the state's proof regarding the two attempted murder charges. A motion for judgment of acquittal made at the conclusion of the state's proof is waived for appellate purposes when a defendant thereafter presents evidence on his or her own behalf. Mathis v. State, 590 S.W.2d 449, 453 (Tenn. 1979); *see* Tenn. R. Crim. P. 29(a). After the trial court denied the motion, the defendant failed to stand on his motion; instead, the defendant elected to call witnesses to testify on his behalf. Therefore, we conclude this issue is not the proper subject of review. However, we will address the sufficiency of the evidence regarding these convictions. In doing so, we review all the evidence, not just that offered by the state in its case-in-chief.

### B.  Standard of Review

In Tennessee, great weight is given to the result reached by the jury in a criminal trial. A jury verdict accredits the state's witnesses and resolves all conflicts in favor of the state. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *Id.*; State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Moreover, a guilty verdict removes the presumption of innocence which the appellant enjoyed at trial and raises a presumption of guilt on appeal. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The appellant has the burden of overcoming this presumption of guilt. *Id.*

Where sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Abrams, 935 S.W.2d 399, 401 (Tenn. 1996). The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996).

## C. Accomplice Testimony

The defendant submits the testimony of Gant, an accomplice, was not sufficiently corroborated by other evidence presented at trial. We disagree.

In Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001); State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). In order to qualify as corroborative evidence,

> [t]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity.

Bigbee, 885 S.W.2d at 803 (citations omitted).

According to Chastity Buie's testimony and the defendant's statement to the police, the defendant arranged a drug transaction between Jennings and the victims. Buie testified that when she informed the defendant that the victims decided not to purchase the drugs, the defendant became angry and threatened her. The witnesses who were present at the apartment testified the defendant remained on the telephone for the majority of the evening prior to the incident. Taylor testified he heard the defendant, while speaking on the telephone, say, "Bring the guns." According to the telephone records, there were three telephone calls between the Buies' telephone number and a number listed under the name of Jennings' mother placed prior to the incident.

Taylor testified that after the gunmen left the apartment, the defendant appeared to have reached into Houston's back pocket. He then saw the defendant running down the street with the gunmen, and one of the gunmen yelled, "Come on, Pharez." We conclude this evidence was sufficient to corroborate Gant's testimony and to link the defendant with the crimes.

## D. Facilitation Generally

With regard to the convictions in which sufficiency is at issue, the jury found the defendant guilty of facilitation of a felony. "A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for

-8-

criminal responsibility . . . , the person knowingly furnishes substantial assistance in the commission of a felony." Tenn. Code Ann. § 39-11-403(a). This statute applies to a person who provides substantial assistance to another in the commission of a felony but does so without the intent to promote, assist in, or benefit from the commission of the felony. State v. Ely, 48 S.W.3d 710, 720 (Tenn. 2001).

## E. Facilitation of Felony Murder

The defendant was charged in the indictment with the felony murder of Houston. The jury acquitted the defendant of criminal responsibility for felony murder and, instead, convicted him of facilitation of felony murder, a lesser-included offense.

The offense of facilitation of felony murder requires proof that:

1. a killing was committed in the perpetration of one of the felonies specified by Tenn. Code Ann. § 39-13-202(a)(2) or (3);

2. the defendant knew that another person intended to commit the underlying felony, but he or she did not have the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense; and

3. the defendant furnished substantial assistance to that person in the commission of the felony; and

4. the defendant furnished such assistance knowingly.

Ely, 48 S.W.3d at 719-20 (emphasis added); *see* Tenn. Code Ann. § 39-13-202(a)(2) (providing that the killing be committed either in the perpetration of, or the attempt to perpetrate among other felonies, a robbery).

Viewing the evidence in a light most favorable to the state, the evidence established that the defendant arranged a drug transaction between Jennings and Houston. Upon learning that Houston no longer wanted to purchase the drugs, the defendant became angry and told Chastity Buie that he would "fix" her. The defendant had approximately four telephone conversations with Jennings prior to the robbery. During one of these conversations, he informed Gant of the location of the apartment and the victims' vehicle, and he also told Gant that he would leave the back sliding glass door open for them. Taylor testified he heard the defendant tell someone over the telephone to "Bring the guns."

Jennings, Gant, and Pillow entered the apartment with weapons. While Gant and Houston were struggling over a weapon, Pillow shot Houston in the chest and killed him. After the gunmen ran out of the apartment, the defendant reached into Houston's back pocket, where Taylor had earlier seen Houston place money. The defendant then jumped from the balcony and fled down the street with the gunmen, one of whom yelled, "Come on Pharez." We conclude the evidence was

-9-

sufficient to support the defendant's conviction for facilitation of murder committed during the perpetration of or attempt to perpetrate robbery.

### F. Facilitation of Attempted First Degree Murder and Attempted Second Degree Murder

The defendant was charged in the indictment with two counts of attempted premeditated first degree murder of Massey and Readus. The trial court also charged attempted second degree murder, attempted voluntary manslaughter, and facilitation of each of the offenses as lesser-included offenses. The jury acquitted the defendant of the attempted premeditated first degree murder, facilitation of attempted first degree murder, and attempted second degree murder of Massey and convicted him of facilitation of attempted second degree murder of Massey. In addition, the jury acquitted the defendant of the attempted premeditated first degree murder of Readus and convicted him of facilitation of attempted premeditated first degree murder of Readus.

A person commits criminal attempt when he or she acts with the kind of culpability otherwise required for the offense and

> (1) [i]ntentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

> (2) [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

> (3) [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

The applicable definition of first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation necessitates "a previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn. 1992) (citations omitted), and "an act done after the exercise of reflection and judgment . . . [meaning] that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). Furthermore, second degree murder is the unlawful and "knowing killing of another." Id. § 39-13-210(a)(1).

In order to support the conviction for facilitation of attempted premeditated first degree murder of Readus, the evidence must establish the defendant knew the gunmen intended to commit premeditated murder and furnished substantial assistance in the commission of the offense. See id. § 39-11-403(a). In addition, to support the conviction for facilitation of attempted second degree murder of Massey, the evidence must establish the defendant knew the gunmen intended to commit a knowing killing and substantially assisted in the commission of the offense. See id. However, viewing the evidence in a light most favorable to the state, the evidence fails to indicate that the

-10-

defendant knew the gunmen intended to murder the two victims. Rather, the evidence establishes that the defendant knew the gunmen only intended to rob the victims.

Therefore, we conclude the evidence is insufficient to support these two convictions. Furthermore, we envision no other sustainable lesser-included offenses of attempted premeditated first degree murder should we remand. Accordingly, we reverse and dismiss the convictions for facilitation of attempted first degree murder and facilitation of attempted second degree murder and dismiss these two counts of the indictment.

## G. Facilitation of Attempted Especially Aggravated Robbery

The defendant was originally indicted for the especially aggravated robbery of Houston. The jury acquitted the defendant of this charge, as well as the lesser-included offenses of facilitation of especially aggravated robbery and attempted especially aggravated robbery, and convicted him of facilitation of attempted especially aggravated robbery.

Especially aggravated robbery is robbery "[a]ccomplished with a deadly weapon" and "the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a)(1)-(2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or by putting the person in fear." *Id.* § 39-13-401(a).

As previously stated, the proof at trial established the defendant knew the gunmen intended to commit an aggravated robbery; at the very least, an attempted aggravated robbery occurred; and the defendant furnished them with substantial assistance in the commission of the offense. It is further undisputed that Houston was killed, thereby suffering serious bodily injury. Thus, all elements of facilitation of an attempted especially aggravated robbery were established. The evidence was sufficient to support the conviction.

## III. CONCLUSION

In summary, we conclude the trial court properly found David Eric Taylor competent to testify at trial. In addition, the evidence was sufficient to support the convictions for facilitation of felony murder and facilitation of attempted especially aggravated robbery; however, the evidence was insufficient to support the convictions for facilitation of attempted first degree murder and facilitation of attempted second degree murder. Therefore, we reverse and dismiss these two convictions.

As to the defendant's sentences, the trial court imposed consecutive sentences of twenty-five years for facilitation of felony murder, six years for facilitation of attempted second degree murder, and twelve years for facilitation of attempted first degree murder. The trial court further imposed concurrent sentences of six years for facilitation of attempted especially aggravated robbery and two years for felony reckless endangerment, for an effective sentence of forty-three years. Sentencing was not raised as an issue on appeal. In light of our dismissal of the two facilitation of attempted murder convictions, we remand to the trial court for a determination of whether the remaining two sentences should run concurrently or consecutively to the facilitation of felony murder sentence.

*See* <u>State v. Perry Singo</u>, No. M2001-00919-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 677, at ** 31-32 (Tenn. Crim. App. Aug. 9, 2002, at Nashville), *perm. to app. denied* (Tenn. 2002).

 

 

 

 

 

 

JOE G. RILEY, JUDGE